THE STATE OF PENNSYLVANIA, COMPLAINANT, *v.* THE WHEELING AND BELMONT BRIDGE COMPANY, WILLIAM OTTERS.N, AND GEORGE CROFT.

In a cause depending in this court in the exercise of original jurisdiction, wherein the State of Pennsylvania complained of the erection of a bridge across the Ohio River at Wheeling, the cause was referred to a commissioner, for the purpose of taking further proof, with instructions to report to the court by the first day of the next stated term.

THIS case was transferred to this court by an order of Mr. Justice Grier, one of the judges of the Supreme Court of the United States, under the following circumstances.

On the 16th of August, 1849, at the court-room of the Circuit Court of the United States, in the city of Philadelphia, before Mr. Justice Grier, one of the judges of the Supreme Court of the United States, Mr. Stanton appeared to move for an injunction in behalf of the State of Pennsylvania, at the instance of her Attorney-General, against the Wheeling and Belmont Bridge Company, and their agents, William Ottersan and George Croft.

Notice of the motion was given on the 28th of July. At the same time, a copy of the bill was served upon the defendants. The bill stated, among other things, —

"That the Ohio River, being one of the navigable waters leading into the Mississippi, is, and for a long time hath been, an ancient navigable public river, and common highway, free to be navigated by the citizens of the State of Pennsylvania, as well as by all other citizens of the United States. That heading at Pittsburg, in the State of Pennsylvania, and running through that State for the distance of fifty miles, navigable for its whole extent from Pittsburg to its mouth, many citizens of that State long have been, and of right were, and still are, accustomed to navigate said river, to pass and repass

along its course and channel unobstructed and at pleasure, with their steamboats, transporting passengers in great numbers, carrying large quantities of freight, and conducting a valuable trade and commerce between the city of Pittsburg, in the State of Pennsylvania, and the ports of Cincinnati, Louisville, St. Louis, New Orleans, and many other places on the Ohio and Mississippi Rivers, and their branches.

" That the defendants are erecting a bridge one hundred miles below Pittsburg, across the channel of the Ohio River, between Zane's Island and the main Virginia shore or bank at Wheeling. That this bridge will hinder and prevent the passage of citizens of the State of Pennsylvania along said river under said bridge, with their steamboats, as they are commonly accustomed to do, and will obstruct the navigation of the Ohio River. That it will interrupt, hinder, and disturb the citizens of the State of Pennsylvania in their lawful use and enjoyment of the Ohio River as a common highway, in passing and repassing the same, will increase the difficulty, hazard, and expense of navigating it with their steamboats carrying passengers and freight as they have been accustomed, and are now doing, and have right to do; and will interrupt, diminish, and greatly disturb the trade, commerce, and business of the citizens of Pennsylvania over and upon said river, and between the city of Pittsburg and other ports on the Ohio and Mississippi Rivers and their branches; to the great damage and common nuisance of the citizens of Pennsylvania, as well as of other citizens of the United States, and to their irreparable injury."

It also stated that the bridge was erected under color of an act of the Virginia General Assembly, which provides, " If the said bridge, mentioned in the eighth section of this act, shall be so erected as to obstruct the navigation of the Ohio River in the usual manner, by such steamboats and other crafts as are now commonly accustomed to navigate the same, when the river shall be as high as the highest floods heretofore known, then, unless, upon such obstruction being found to exist, such obstruction shall be immediately removed or remedied, the said last-mentioned bridge may be treated as a public nuisance, and abated accordingly." That steamboats were accustomed to navigate the river requiring a space of eighty feet above the water surface, and that the flood of 1832 was $44\frac{1}{2}$ feet above low-water level, usual spring floods being 35 feet, and that the bridge was to be only $93\frac{1}{2}$ feet above low-water level at its eastern end, and 62 feet at the west end.

It was also stated, by way of amendment, that the State of Pennsylvania owned and possessed certain valuable public im-

provements of canals and railways for the transportation of pas-sengers and goods, constructed at a great expense, for channels of commerce, to connect the waters of the Delaware River with the Ohio at Pittsburg, and the waters of Lake Erie with the Ohio at Beaver. That from the transportation of passengers and goods along these works, she was accustomed to receive large tolls and revenue. That these works terminated at, and are constructed with direct reference to the free navigation of, the Ohio River. That the goods and passengers transported to and from those ports upon her improvements were accustomed to arrive and depart in steamboats along the Ohio River; and that the Wheeling Bridge would so obstruct the navigation of the river as to cut off the trade and business along the public works of Pennsylvania, impair and diminish her tolls and reve-nue, and render her improvements useless.

The bill prayed injunction and general relief.

With the bill were filed exhibits, viz. : —

1. The Act of Incorporation by the General Assembly of Vir-ginia, under which defendants claim right to erect the bridge.

The charter contains this clause : —

"If the said bridge, mentioned in the eighth section of this act, shall be so erected as to obstruct the navigation of the Ohio River in the usual manner, by such steamboats and other crafts as are now commonly accustomed to navigate the same, when the river shall be as high as the highest floods heretofore known, then, unless, upon such obstruction being found to exist, such obstruction shall be immediately removed or remedied, the said last-mentioned bridge may be treated as a public nui-sance, and abated accordingly."

2. A Report of the Engineer of the Bridge Company, accom-panied by a diagram.

In this report, the bridge is represented to be 92 feet, at the water's edge, above the low-water line on the Wheeling side, and on the island side 62 feet, deflecting from the water's edge at Wheeling to the island at the rate of 4 feet in 100.

The report also states, that the flood of 1832 was 44½ feet above the low-water level.

A supplemental bill was also exhibited by complainant's coun-sel, setting forth that, since the preparation of the original bill and service of notice, the defendants had proceeded with their work, and had stretched iron cables across the channel of the river so as to obstruct navigation. It prayed that these might be abated, and for relief, as in the original bill.

The complainant's counsel then read affidavits to show, among other things : —

1. The amount of steamboat trade and commerce of the Ohio, between Pittsburg and the ports of Cincinnati, Louisville, St. Louis, New Orleans, and other places on the Ohio and Mississippi Rivers.

2. That a large portion of the steamboats engaged in this trade are owned and navigated, in whole or in part, by citizens of Pennsylvania.

3. That the principal steamboats engaged in this trade require for free passage from sixty to eighty feet space above the water surface, and, as now constructed, cannot, on high water, pass the bridge at Wheeling.

4. That the present diameter and height of their chimneys have been found by experience to be essential to their speed and capacity, and cannot be reduced without impairing the fitness of the boats for profitable and useful trade and commerce.

5. That their chimneys cannot be lowered so as to pass the bridge at Wheeling on high water, without changing their construction, at a great expense; and the process of lowering and hoisting will always be attended with expense, delay, and imminent hazard to the safety of the boat, its crew and passengers, — chimneys being six feet in diameter, and over forty feet above the hurricane deck.

6. That the Pittsburg packets, and other boats of the largest class, have been accustomed to navigate the river to and from Pittsburg, at their present height, and no boats lower their chimneys except when compelled by the state of water in the river to pass through the canal around the falls at Louisville.

7. That the boats accustomed to lower at Louisville are built with reference to passing through the canal, and are much smaller in size and capacity than the Pittsburg packets, and other boats accustomed to navigate the rivers in high waters.

8. That, in the opinion of many practical men, it is impossible to reduce or lower the chimneys of such boats as are engaged in the packet trade. And that the bridge at Wheeling will so obstruct their navigation at high water, for which they are specially adapted, as in a great measure to exclude them from business and diminish their value; there being seven packets, costing each from thirty to forty thousand dollars.

9. That the bridge at Wheeling will so obstruct navigation that a large portion of trade hitherto accustomed to pass and repass to and from Pittsburg will be excluded from that port and other ports of Ohio and Pennsylvania above Wheeling.

10. That, in the opinion of competent engineers, a bridge might be so erected as not to obstruct navigation.

The defendants then filed to the original bill their answer, in which it was set forth, —

That by the statutes of Virginia, referred to in the bill, the defendants are the delegates and trustees of certain franchises, part of the eminent domain of that State, exercisable within her territory.

That the sovereignty of Virginia over the place in which this erection is to be made has never been ceded or surrendered. That the clause of the Ordinance of 1787 which declared that "the navigable waters leading into the Mississippi and St. Lawrence, &c., shall be common highways, and for ever free to the citizens of the United States," &c., was not intended to operate within the reserved territory and sovereignty of Virginia.

That a free navigation is not to be understood as one free from such partial or incidental obstacles as the best interests of society may render necessary, and does not prevent States from constructing in or over such rivers such beneficial bridges or useful improvements of navigation as may not materially obstruct them as highways.

That Congress, in 1806, ordered a road to be constructed from Cumberland to the Ohio, and afterwards provided for its continuation from the western bank of Ohio to the Muskingum River and Zanesville, and so on through the States of Ohio, Indiana, and Illinois. That this road was afterwards surrendered to the States through which it passed.

That the passage by ferry between Wheeling and Zane's Island was found dilatory and precarious by day, and ordinarily useless by night, being frequently impassable on account of ice, &c.

That, a bridge being much desired by the people of Ohio and Virginia, acts were passed in 1816 by those States, authorizing a bridge across the river at Wheeling, but which provided that, if such bridge should be so constructed as to injure the navigation of the said river, it should be treated as a public nuisance, and be liable to abatement as other public nuisances. And ten years were allowed for completion of the bridge.

That, by an act of Virginia of 1836, certain facilities for the reorganization of the said company were conferred, and the time, by consent of Ohio, extended ten years longer ; that this company constructed a bridge from Zane's Island to the Ohio, or western shore.

That on the 14th of March, 1847, the Legislature of Virginia passed an act reviving and continuing certain parts of the former acts, and providing for the reorganization of the corporation "with power to erect and keep a wire suspension toll-bridge on and from Zane's Island to and upon the main Virginia shore or bank at the city of Wheeling."

That this act had the following proviso: — "That if the said br dge shall be so erected as to obstruct the navigation of the Ohio River in the usual manner, by such steamboats and other crafts as are now accustomed to navigate the same, when the river shall be as high as the highest flood therein heretofore known, then, unless, upon such obstruction being found to exist, such obstruction shall be immediately removed or remedied, the said last-mentioned bridge may be treated as a public nuisance, and abated accordingly."

That respondents were organized under this act in May, 1847, and an engineer appointed in July, 1847, who reported a plan, which was published and extensively circulated, and made contracts for its erection in September, 1847.

That the elevation of the bridge at the highest point over the channel is over $93\frac{1}{2}$ feet above low-water surface.

That for eighteen months past it has been "steadily and notoriously progressed with"; that the persons at whose suggestion these proceedings are instituted must have known it, and yet, while all this expensive work was being done, no objections were made, but the work quietly permitted to progress until nearly the whole cost of the bridge was expended, the first wires drawn over, and the bridge on the eve of completion.

The answer insists on the following grounds of objection to the proceedings: —

1st. That if the evils imputed to this bridge were true, the persons injured might have remedy in the courts of Virginia, and her Attorney-General is ready to institute proceedings by *quo warranto* or indictment.

2d. That the complainant has no corporate capacity to become a party to a suit in the Supreme Court, to protect or vindicate the rights of her citizens, and prays that this part of their answer may stand for a demurrer or plea, as well as answer.

3d. The defendants admit that the citizens of Pennsylvania, in common with the citizens of the whole United States, are entitled to the use of the Ohio as a common or public highway, but claim that their bridge is not an obstruction, and is itself a connecting line of a great public highway, as important, as a means of intercommunication, as the navigation of the Ohio, and "claim the principle of concession and compromise, which enters so largely into the structure of our government." That this bridge will be very beneficial to the people of the neighbouring States.

4th. That the State of Pennsylvania herself has set the example of authorizing bridges to be constructed across this stream no higher than this.

5th. That the report of certain, engineers of the United States to Congress, in 1848, recommended a wire bridge, and gave as their opinion, that "by an elevation of ninety feet every imaginable danger of obstructing or endangering the navigation would be avoided." Also, that certain reports of committees in Congress recognized the necessity of a bridge at Wheeling, and recommended an appropriation, stating that a bridge can be erected that will not offer the slightest obstruction to the navigation.

6th. That the objections to the bridge are only to the insufficiency of headway for steamboats, and they aver that the headway left is amply sufficient; that the highest usual rise of the river Ohio does not exceed thirty-eight and a half feet, but will not average thirty-five feet for spring floods, nor much exceed twenty-nine feet; that the flood of 1832 was an extraordinary flood, which rose forty-four and a half feet above low water at Wheeling, on the 11th of February, 1832; that landings and warehouses were under water, and the river too high for navigation, or, if navigated, that boats might have passed over Zane's Island.

7th. That for all useful purposes the pipes of steamboats need not exceed forty-seven feet above the water, and if the draft should not be sufficient at that height, that blowers might be added. That chimneys might have hinges on them, so that they could be lowered without much inconvenience. That the bridge over the canal at Louisville does not give a headway of over fifty-six feet, and chimneys of greater height usually have hinges to accommodate themselves to it, and steamboats made with high chimneys and without hinges should conform, "because the height of chimneys of steamboats above a certain limit involves secondary considerations of contingent and relative expediency or convenience, rather than such as are of absolute importance or necessity in connection with the material or indispensable purposes of navigation."

8th. That the bridge will not be an appreciable inconvenience to boats of the average class, whose height, they aver, will not average over fifty-two feet, and not sixty-five feet, as stated in the bill; but it is admitted that there are boats whose chimneys are of greater height, which is asserted to be unnecessary; or, if necessary, they should be provided with hinges; that these high chimneys have been but lately brought into use, are of "extravagant and unnecessary" height, and "got up" by commercial rivals, who promote these proceedings "in the name of a sovereign State, to destroy a useful and necessary work."

55 *

9th and lastly. That the bridge will not diminish or destroy trade between Pittsburg and other ports, or do irreparable injury to the citizens of Pennsylvania.

Affidavits were also read to support the answer.

After argument by counsel, Mr. Justice Grier delivered an opinion, which concluded as follows : —

" The application of the principles I have stated to the facts of this case will result in refusing, without prejudice, an injunction before the sitting of the Supreme Court, for the following reasons : —

" 1st. Because the question of the plaintiff's right to prosecute this is new, and involves the jurisdiction of the court. For if the State of Pennsylvania is not entitled to prosecute such an action, the Supreme Court can have no original jurisdiction in the case.

" 2d. The injury threatened is not imminent and certain, but contingent. It may or may not happen before the final hearing of this cause, or before this application may be renewed before the court. In the mean while, this cause may be brought to a final hearing, the cause being now at issue, and having preference on the list. And on the first Monday of December next the plaintiff will have an opportunity of moving the court for an injunction on the bill and answer, when the question of jurisdiction can be finally decided. Nor is there any evidence to justify the supposition, that in the mean time the income of the Pennsylvania improvements will be materially affected.

" 3d. The injury will not be irremediable if any should occur ; as the owner of every boat which may be hindered or delayed in the mean time from passing along the river by this obstruction will have a clear remedy at law, to recover damages against the company and the individuals engaged in its erection.

" 4th. If the defendants proceed in the mean time to complete the bridge, they will gain no equity thereby ; but if judgment be obtained against them, they will be compelled to abate the nuisance at their own expense.

" It is therefore ordered, that said bill and supplemental bill, answers, and exhibits here read, be filed in the clerk's office of the Supreme Court of the United States, and that the defendants answer the amendment and supplemental bill within thirty days, and that on the first day of the next term of the Supreme Court of the United States the complainant have leave to move for an injunction, as prayed for in said original and supplemental bills, and that this order and notice be entered by the clerk on the docket of said court."

Pursuant to this order, the bill, supplemental bill, and answers were filed in the office of the clerk of the Supreme Court, at Washington, on the 6th of September, 1849.

On the 7th of October, 1849, the Wheeling and Belmont Bridge Company filed their answer to the amended and supplemental bills, reiterating the grounds of defence assumed in the first answer, and suggesting others which had not been previously noticed.

On the 12th of November, 1849, the plaintiff served on the defendant a notice of her intention to apply to the Supreme Court for an injunction, as prayed for in the original and supplemental bills, on other grounds which were set forth in a second supplemental bill, a copy of which accompanied the notice. This second supplemental bill averred that the defendants had erected their bridge over the channel of the Ohio in such a manner as to hinder, and obstruct, and prevent the passage of steamboats, owned and navigated by citizens of Pennsylvania, to and from her ports, over and along said river, and from passing from Pittsburg to other ports in Ohio and Kentucky below said bridge. It charges, that on the 10th day of November, 1849, the steamboat Messenger, owned and navigated by citizens of Pennsylvania, engaged in the carrying trade between Pittsburg, a port of entry in Pennsylvania, and Cincinnati, a port of entry in Ohio, and intermediate ports, duly licensed, equipped, and enrolled according to the acts of Congress, cleared from the said port of Pittsburg with a large cargo of freight and passengers for the port of Cincinnati and other intermediate ports, and while on her voyage along the channel of said river, on the night of the 10th of November, at a usual stage of water, to wit, twenty-one feet, was hindered and obstructed from passing along said channel, and obliged to stop by reason of said bridge, and with great trouble and danger to the officers and crew, and expense and loss of time to her owners, was compelled to have seven and a half feet of her chimneys cut off in order to pass said bridge.

It is further alleged that the Hibernia, another boat owned and navigated by citizens of Pennsylvania, on a voyage from Cincinnati to Pittsburg, on the 11th day of November, 1849, was hindered by said bridge from prosecuting her voyage, and obliged to stop at Wheeling, a port of entry in Virginia, and there discharge her passengers and cargo.

The bill further charges, that, since the filing of said original bill, sundry citizens of Pennsylvania have contracted for, and are engaged in, the construction of ships and sea-going vessels, to be propelled by wind and steam, and desire to continue in

said business. That the building of such vessels is a profitable branch of business, and that any obstruction to the navigation of the Ohio River at high stages of water will interfere with and destroy said branch of business, and prove alike detrimental to the revenues of the Commonwealth of Pennsylvania and to the interests of her citizens. It is further charged, that the Wheeling Bridge will produce this result, and practically give a preference to the port of Wheeling and other ports lower down the river, to the great injury of the citizens and State of Pennsylvania. The plaintiff, therefore, prays that the defendants may be enjoined from keeping said bridge across said river, and be required to abate the same.

On the 2d of February, 1850, the defendants filed their answer to the second supplemental bill.

It stated, "that, since the filing of their former answers in this case, the Legislature of the State of Virginia have passed an act amendatory and explanatory of the various acts which had been previously passed by that body, (and which taken together constituted the charter under which your respondents erected their bridge,) and more particularly of the fourteenth section of the act passed March 19, 1847. This amendatory and explanatory act declares in substance, that, whereas the Wheeling and Belmont Bridge Company, by virtue of an act passed March 19, 1847, entitled 'An act to revive and amend an act, entitled an act incorporating a company to erect a toll-bridge over the Ohio River at Wheeling, passed February 10, 1836,' had erected across and over the main channel of the Ohio River, from the main Virginia shore to Zane's Island, at the city of Wheeling, in Ohio County, a wire suspension-bridge, consisting of a single span of one thousand and ten feet from centre to centre of the supporting towers, the height of which is ninety feet at the eastern abutment, ninety-three and a half feet at the highest point, and sixty-two feet at the western abutment, above the low-water level; and whereas the fourteenth section of the said act of March 19, 1847, provided, among other things, that the said wire suspension-bridge should be so erected as not 'to obstruct the navigation of the Ohio River in the usual manner, by such steamboats and other crafts as were then commonly accustomed to navigate the same, when the river should be as high as the highest floods therein heretofore known'; and whereas doubts had arisen as to the true construction or meaning of the said fourteenth section; and it was desirable to remove such doubts, and more clearly to express and declare the true intention and meaning of the aforesaid section, it was by said act declared and enacted, that the said wire suspension-

bridge, so erected across the Ohio River, at Wheeling, as afore-said, at the height of ninety feet at the eastern abutment, ninety-three and a half feet at the highest point, and sixty-two feet at the western abutment, above the low-water level of the Ohio River, be, and the same thereby was, declared to be of lawful height, and in conformity with the intent and meaning of the said fourteenth section of the act of March 19, 1847.

" A copy of which said act of the General Assembly of Virginia, passed January 11, 1850, and duly authenticated, is here-with exhibited, and prayed to be taken, received, and read, as a part of this answer.

" Your respondents further say, that said act above exhibited furnishes a full and complete answer to all the objections urged by the complainant to your respondents' bridge, on the ground that it has not been constructed in conformity with the requisitions of the charter of the company.

" Your respondents, therefore, rely on said act of Assembly of Virginia for that and for all other purposes for which it may legally avail, and pray that they may be allowed the benefit of all defences arising under said act, in the same manner, and to the same extent, as if specially pleaded.

" Having fully answered, your respondents pray to be hence dismissed, with their costs by them in this behalf unjustly expended."

Numerous depositions were filed on behalf of the complainant and respondents, which it is not expedient further to refer to, as the order of the court is merely interlocutory.

The cause was opened by *Mr. Darragh* and *Mr. Stanton*, for the complainant, and concluded upon the same side by *Mr. Walker*. For the respondents, it was argued by *Mr. Stuart* and *Mr. Johnson* (Attorney-General). A report of the arguments of the counsel is deferred until the final decision of the case.

Mr. Justice NELSON announced that the court had passed the following interlocutory order.

The court having heard the counsel on the part of the complainant, and also on the part of the respondents, on the motion for an injunction in this cause to remove the obstruction of the navigation of the Ohio River, as charged in the original, amended, and supplemental bills of the complainant, by means of the erection of the suspension bridge in said bills mentioned, and which said obstruction is denied in the answers put in thereto by the respondents; and on due deliberation being had thereon,

and upon the pleadings and the proofs before us, it is ordered, that the cause be referred to the Honorable R. Hyde Walworth, late Chancellor of the State of New York, as a commissioner of the court, hereby appointed, to take such further proofs in the cause as the counsel for the respective parties may see fit to produce before him, at such time or times, and at such place or places, as he may appoint, on the application of the counsel of either party; due notice being given of the time and place of the taking of the said proofs.

1. Upon the question, whether or not the bridge aforesaid, mentioned in the pleadings aforesaid, is or is not an obstruction of the free navigation of the said Ohio River at the place where it is erected across the same, by vessels propelled by steam or sails, engaged, or which may be engaged, in the commerce or navigation of said river; and if an obstruction, as aforesaid, shall be made to appear, what change or alteration in the construction and existing condition of the said bridge, if any, can be made, consistent with the continuance of the same across said river, that will remove the obstruction to the free navigation by the vessels aforesaid, engaged in the commerce and navigation of said river as aforesaid; and,

2. That the said commissioner shall report to this court by the first day of the next stated term thereof, upon the questions hereby referred to him, together with the proofs which shall have been produced before him by the respective parties. And that all other questions in the said cause shall be reserved until the coming in of the said report of the commissioner, and the further hearing of counsel upon the matters therein; and,

3. That the said commissioner shall have the power, if deemed necessary by him in the course of the hearing of the said cause, to appoint a competent engineer, whose duty it shall be to take the measurement of said bridge, its appendages and appurtenances and localities in connection therewith, under the direction and instructions of said commissioner, and to make a report to him on the same, which report shall be annexed to the report of the said commissioner to this court.

The said commissioner is hereby authorized to appoint a clerk to assist him in the execution of this commission.

The compensation to be allowed to the said commissioner for his time and services, for his clerk and engineer that may be appointed, and all other necessary expenses by him incurred in said commission, upon the coming in of the report of the commissioner, will be ascertained and fixed and awarded against the parties, as the court may deem right and proper, upon the principles of equity and justice.

And that the parties shall each advance to the said commissioner two hundred and fifty dollars, before or at the time he enters upon the execution of the commission.

The clerk will send a certified copy of this order to the commissioner.

To this order Mr. Justice DANIEL dissents. It is his opinion, that the case is not presented to this court between such parties in interest as can give jurisdiction to this court. The only legitimate ground of jurisdiction in this case, under the Constitution, would be the fact of such a direct interest or right on the part of Pennsylvania as a State as would authorize her to become a party in this controversy. The interest of the State of Pennsylvania in this case, if indeed any such is shown, is that which she may have in the competition which may or which does exist between works of public improvement erected by herself, and rival works erected by other States within their own territory. No direct interest on the part of the State of Pennsylvania is shown in the vessels or steamboats which navigate the rivers Ohio and Mississippi, nor in any question connected with the rights of that State separate and apart from the individual interests of the owners of steamboats, or other private citizens of the State of Pennsylvania. Again, the question of nuisance or no nuisance is one proper for the cognizance of a court of law, to be determined by a jury upon the testimony of witnesses confronted and cross-examined before a jury in open court, and under its supervision. In this view of the question, it would seem to be irregular to determine it upon affidavits and by a court of equity, and without the interposition of a jury, and in the absence of the witnesses. The order now made in this cause seeming to lead to the latter mode of settling the question of nuisance, it is therefore hereby formally objected to.